UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

In re: QUEBECOR WORLD (USA) INC.,           :
                                            :
                            Debtor.         :
                                            :
------------------------------------------------------------------X
OFFICIAL COMMITTEE OF UNSECURED             :
CREDITORS OF QUEBECOR WORLD (USA) INC.,     :
                                            :
                            Plaintiff/Appellant,   :
                                            :
                  -v-                       :
                                            :
AMERICAN UNITED LIFE INSURANCE              :
COMPANY et al.                              :
                                            :
                            Defendants/Appellees.  :
------------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED: 9/28/12              │
└─────────────────────────────────┘
```

11 Civ. 7530 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

In October 2007, shortly before it filed for bankruptcy, Quebecor World (USA) Inc.

("QWUSA") paid more than $376 million to purchase and redeem a series of private placement

notes that an affiliated company had issued years earlier. The question in this case is whether

those payments can be "avoided" — that is, recaptured as part of the bankruptcy estate — on the

ground that they were "preferential" transfers, or whether they are protected from avoidance as

either "settlement payments" or transfers "in connection with a securities contract." Appellant

Official Committee of Unsecured Creditors of Quebecor World (USA) Inc. ("Appellant")

appeals from an order of the United States Bankruptcy Court for the Southern District of New

York (James M. Peck, B.J.), entered on August 17, 2011, granting Appellees' motion for

summary judgment. *See Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc.*

*v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 453 B.R. 201 (Bankr. S.D.N.Y.

2011) ("*Quebecor*"). Relying on the Second Circuit's decision in *In re Enron Creditors*

*Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011) ("*Enron*"), the Bankruptcy

Court held that the payments at issue were protected as both settlement payments and transfers in

connection with a securities contract. *Quebecor*, 453 B.R. at 215-19.  For the reasons stated

below, this Court agrees and, accordingly, the Bankruptcy Court's order is AFFIRMED.

## BACKGROUND

### A.  The Statutory Scheme

As noted, this case concerns the authority of a bankruptcy trustee to avoid and thus

recapture "preferential" transfers.  To the extent relevant here, Section 547(b) of the Bankruptcy

Code provides that a trustee may recover money or property transferred by an insolvent debtor

on account of an antecedent debt in the ninety days preceding bankruptcy.  *See* 11 U.S.C.

§ 547(b).  This "avoidance" authority serves two important functions.  First, it deters creditors

from racing to the courthouse and hastily forcing troubled businesses into bankruptcy.  *See, e.g.*,

*Union Bank v. Wolas*, 502 U.S. 151, 160-61 (1991); *In re Roblin*, 78 F.3d 30, 40 (2d Cir. 1996).

Second, it promotes equitable treatment of creditors by allowing a trustee to recapture for the

benefit of all creditors preferential payments or transfers made in the months leading up to the

bankruptcy.  *See Wolas*, 502 U.S. at 160-61.

Section 546(e) of the Bankruptcy Code carves out limited exceptions to this avoidance

authority, two of which are relevant to this case.  First, a trustee "may not avoid a transfer that is

a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial institution."  11

U.S.C. § 546(e).  Section 741 of the Code, in turn, defines a settlement payment as "a

preliminary settlement payment, a partial settlement payment, an interim settlement payment, a

settlement payment on account, a final settlement payment, or any other similar payment

commonly used in the securities trade." *Id.* § 741(8).[1]  Second, a trustee "may not avoid . . . a

transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a

securities contract." *Id.* § 546(e).  To the extent relevant here, Section 741 defines "securities

contract" to mean "a contract for the purchase, sale, or loan of a security, . . . including any

repurchase . . . transaction on any such security." *Id.* § 741(7)(A)(i).

 Congress enacted the Section 564(e) safe harbors "to minimize the displacement caused

in the commodities and securities markets in the event of a major bankruptcy affecting those

industries." H.R. Rep. No. 420, 97th Cong., 2d Sess. 2 (1982), *reprinted in* 1982 U.S. Code

Cong. & Admin. News 583, 583.  As the Court explained in *Enron*, "[i]f a firm is required to

repay amounts received in settled securities transactions, it could have insufficient capital or

liquidity to meet its current securities trading obligations, placing other market participants and

the securities markets themselves at risk."  651 F.3d at 334.  "By restricting a bankruptcy

trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the

safe harbor stands 'at the intersection of two important national legislative policies on a collision

course-the policies of bankruptcy and securities law.'" *Id.* (quoting *In re Resorts Int'l, Inc.*, 181

F.3d 505, 515 (3rd Cir. 1999)).

## B.  Facts

 The facts relevant to this case are undisputed.  Quebecor World Inc. ("QWI") is a

Canadian corporation that used to be the second largest commercial printer in the world.  *See*

*Quebecor*, 453 B.R. at 206.  In July 2000, an entity in the Quebecor corporate family, Quebecor

World Capital Corp. ("QWCC"), raised $250 million by issuing a series of private placement

---

[1] Another provision of the Code defines settlement payment in the context of forward
contract trades, *see* 11 U.S.C. § 101, but that definition is irrelevant to this case.

notes to a small group of lenders (the "Noteholders") pursuant to a Note Purchase Agreement. (JA-23 Ex. A1).[2]  In September 2000, QWCC issued another $121 million in private placement notes (together with the July 2000 notes, the "Notes") pursuant to a nearly identical Note Purchase Agreement (together with the July 2000 Note Purchase Agreement, the "NPA").  (JA-23 Ex. A2).  The Notes were guaranteed by QWI and its primary subsidiary in the United States, QWUSA.  (JA-23 Ex. C2 ¶ 94).

Under Section 8.2 of the NPA, QWCC was entitled to redeem or prepay all or part of the Notes at any time and for any reason.  (JA-23 Exs. A1, A2 §8.2).  Upon prepayment, the Noteholders would receive the aggregate principal owed, accrued interest, and a "make-whole" premium designed to compensate the Noteholders for the early payment of the Notes.  (*Id.*). Section 8.5 of the NPA specified that "[a]ny Note paid or prepaid in full shall be surrendered to the Company and cancelled and shall not be reissued, and no Note shall be issued in lieu of any prepaid principal amount of any Note."  (JA-23 Exs. A1, A2 § 8.5).  Section 8.6 of the NPA further provided that QWI and any controlled affiliates were prohibited from purchasing, redeeming, prepaying or otherwise acquiring the Notes except "(a) upon the payment or prepayment of each series of the Notes in accordance with the terms of this Agreement and the Notes or (b) pursuant to an offer to purchase" made by QWI or a controlled affiliate "pro rata to the holders of all Notes at the time outstanding at the same time and upon the same terms and conditions."  (JA-23 Exs. A1, A2 § 8.6).

The NPA also included a limitation on QWI's debt-to-capitalization ratio, which provided that if that ratio exceeded 55% on the last day of any fiscal quarter ending after

---

[2]      In addition to their briefs, the parties have submitted a Joint Appendix, comprised of forty-seven documents.  "JA-[NUMBER]" refers the relevant document in this Appendix.

December 31, 2000, all outstanding Notes would be immediately due to the Noteholders,

including principal owed, accrued interest, and the make-whole premium.  (JA-23 Exs. A1, A2

§§ 10.1, 13.1(a), (c)).  By May of 2007, QWI and its subsidiaries were in financial distress and at

risk of breaching this covenant.  (Appellant's Br. at 8; Appellees' Br. at 8-9).  To avoid the

potentially catastrophic consequences of such a breach, QWI attempted to modify the covenant

through a partial tender offer to just over half of the Noteholders in exchange for their support in

raising the debt-to-capitalization ratio to 65%.  (Appellant's Br. at 9; Appellees' Br. at 9).  The

Noteholders, however, unanimously rejected the tender offer and instead signed a Noteholder

Cooperation Agreement and Right of First Refusal Agreement, pursuant to which they agreed

not to sell the Notes outside the then-existing group of Noteholders.  (Appellant's Br. at 10;

Appellees' Br. at 9).  It appears that these agreements were intended to prevent QWI from

dividing the Noteholders with a partial tender offer, thereby forcing an early prepayment of the

Notes — including the make-whole premium — to all Noteholders.  (Appellant's Br. at 10).

        In September 2007, the QWI Board of Directors approved prepayment of all the Notes to

avoid breaching the debt-to-capitalization ratio covenant, using cash raised from a separate bank

credit facility.  (JA-23 Exs. B1-B4 at 53).  On September 28, 2007, QWCC sent each Noteholder

a "Notice of Redemption" stating that, on October 29, 2007, it intended to "redeem" in full all

outstanding Notes under Section 8.2 of the NPA.  (*E.g.*, JA-23 Exs. B5-11 at 16).  The notice

directed each Noteholder to "surrender" the Notes "for cancellation, pursuant to Section 8.5 of

the [NPA]."  (*E.g.*, *id*. at 17).  Several weeks later, however, QWI realized that QWCC's

redemption of the Notes would result in unwanted tax liabilities under Canadian law.  At the last

minute, therefore, QWI restructured the transaction as a purchase of the Notes by QWUSA,

which would then surrender the Notes to QWCC for redemption.  (Appellant's Br. at 11).  On

October 25, 2007, QWUSA provided a second notice to the Noteholders that it would pay the "Redemption Price" set forth in the Notice of Redemption, which would "result in QWUSA purchasing the Notes."  (*E.g.*, JA-23 Exs. B12-18 at 1).

On October 29, 2007, QWUSA instructed Bank of America to wire transfer $376,298,061.81 — the sum of the principal, accrued interest, and the make-whole premium — from its main operating account to the trustee for the Noteholders, CIBC Mellon ("CIBC").  (JA-23 Exs. B12-18 at 53).  CIBC then transferred to each Noteholder its portion of the prepayment; it did not, however, take title to the securities or utilize any type of clearing mechanism to complete the transaction.  (JA-23 Exs. D1-D7 at 9).  Regardless, according to the Noteholders, the payment from QWUSA to them was part of a securities transaction that "settled."  (JA-6-22 ¶ 9 & Exs. C.).  Moreover, at least some contemporaneous documents describe the transfer as "settle[d]," occurring on a "settlement date," or the like.  (*E.g.*, JA6-22 Ex. C; JA-30 Ex. C, JA-31 Ex. C; JA-39 Exs. 27-36 at 25).  Following the prepayment, the Noteholders returned the Notes by mailing them directly to QWI in Montreal — a process that dragged on for some months.  (Appellees' Br. at 11).  When returned, two of the fifteen Notes were stamped "PAID IN FULL."  (Appellant's Br. at 12 (citing JA-39 Exs. 64, 81); Appellees' Br. at 13 (citing JA-6-9, 11-16, 18-22)).

On January 21, 2008, QWUSA filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.  Voluntary Petition (Chapter 11), *In re Quebecor World (USA)*, No. 08-bk-10152 (JMP) (Bankr. S.D.N.Y. Jan. 21, 2008) (Docket No. 1).  On September 19, 2008, Appellant commenced this adversary proceeding seeking to avoid the $376 million prepayment of the notes on the ground that it was a "preferential" transfer within the meaning of Section 547(b).  Complaint, *Official Comm. of*

6

*Unsecured Creditors of Quebecor World (USA), Inc. v. Am. United Life Ins. Co.* (*In re Quebecor World (USA) Inc.*), No. 08-ap-1417 (JMP) (Bankr. S.D.N.Y. Sept. 19, 2008) (Docket No. 1).  On October 29, 2010, the Noteholders moved for summary judgment, contending that the payment fell within the safe harbor of Section 546(e).  (08-ap-1417 (JMP), Docket No. 32).  The Bankruptcy Court heard oral argument on January 19, 2011, and held a limited evidentiary hearing on May 4 and 5, 2011.  (08-ap-1417 (JMP), Docket Nos. 70, 73-74).  Shortly thereafter, the Court of Appeals issued its decision in *Enron* and the Bankruptcy Court ordered supplemental briefing on the case.  *See Quebecor*, 453 B.R. at 211.

In a thorough opinion dated July 27, 2011, Judge Peck granted the Noteholders' motion for summary judgment.  *See Quebecor*, 453 B.R. at 219.  Judge Peck held that the transfers at issue fell within Section 546(e) safe harbor for two independent reasons.  First, relying heavily on *Enron*, Judge Peck concluded that the payments qualified as settlement payments, defined as a transfer of cash to a financial institution to complete a securities transaction.  *See id.* at 215.  Second, Judge Peck held — albeit in a footnote — that the payment qualified "as a safe-harbored 'transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7).'"  *Id.* at 212 n.7 (quoting 11 U.S.C. § 546(e)).  Citing the "comprehensive language used to define the term 'securities contract' in section 741(7) of the Code (i.e., 'a contract for the purchase, sale, or loan of a security . . .')," Judge Peck concluded that the NPA is a "securities contract" and that the disputed transfer "[p]lainly" occurred in connection with it.  *Id.*  Further, relying on *Enron*, he rejected Appellant's argument that the clause did not apply to the redemptions of securities.  *See id.*

This appeal followed.

## DISCUSSION

### A.  Jurisdiction and Standard of Review

This Court has jurisdiction pursuant to Title 28, United States Code, Section 158(a)(1) and Rule 8001(a) of the Federal Rules of Bankruptcy Procedure.  In general, a district court reviews a bankruptcy court's findings of fact for clear error and its legal conclusions *de novo*. *See, e.g.*, *In re Layo*, 460 F.3d 289, 292 (2d Cir. 2006); *In re Madoff*, 848 F. Supp. 2d 469, 476 (S.D.N.Y. 2012); FED. R. BANKR. P. 8013.  As noted, however, the relevant facts in the present case are undisputed; the parties' dispute turns instead on the scope and meaning of terms in the safe harbor provision of the Bankruptcy Code.  These are "matter[s] of statutory construction and thus . . . question[s] of law [the Court] review[s] de novo."  *Enron,* 651 F.3d at 334.

### B.  The Safe Harbor for Settlement Payments

The first question on appeal is whether the payments at issue qualify as settlement payments within the meaning of Section 546(e).  As the Bankruptcy Court concluded, to answer to that question requires analysis of *Enron*, in which the Court of Appeals considered "whether the § 546(e) 'safe harbor' . . . extends to transactions in which commercial paper is redeemed by the issuer prior to maturity, using the customary mechanism of the Depository Trust Company." *Enron*, 651 F.3d at 334-34 (quoting *In re Enron Creditors Recovery Corp.*, 422 B.R. 423, 424 (S.D.N.Y. 2004)).  Shortly before filing for bankruptcy, Enron made the payments at issue — totaling more than one billion dollars — to holders of the commercial paper through broker-dealers via the Depository Trust Company (the "DTC"), which served as a "conduit and recordkeeper rather than a clearing agency that takes title to the securities during the course of the transaction."  *Id.* at 338.  After Enron filed for bankruptcy, a creditors committee initiated an adversary proceeding to avoid the redemption payments as preferential under Section 547(b) of

8

the Bankruptcy Code.  The Bankruptcy Court held that the payments were subject to avoidance because they did not fall within the definition of "settlement payments" in Section 546(e), *see In re Enron Creditors Recovery Corp.*, 407 B.R. 17 (Bankr. S.D.N.Y. 2009), but the District Court reversed, *see In re Enron Creditors Recovery Corp.*, 422 B.R. 423 (S.D.N.Y. 2009).

Over a dissent by Judge Koeltl (sitting by designation), the Second Circuit affirmed, holding that the redemption payments did qualify as settlement payments within the meaning of Section 546(e).  The majority acknowledged that Section 741(8) of the Bankruptcy Code, which Section 546(e) incorporates, "defines 'settlement payment' rather circularly."  *Enron*, 651 F.3d at 334.  Nevertheless, following other courts of appeals, the majority adopted an "extremely broad" definition of the term, instructing courts to interpret it, "in the context of the securities industry, as the transfer of cash or securities made to complete a securities transaction."  *Id.* at 334 (internal quotation marks and brackets omitted); *see also id*. at 336-37.  Applying that definition, the majority easily concluded that the redemption at issue fell within the safe harbor of Section 546(e): "The payments at issue were made to redeem commercial paper, which the Bankruptcy Code defines as a security.  They thus constitute the transfer of cash . . . made to complete a securities transaction and are settlement payments within the meaning of § 741(8)."  *Id.* at 339 (internal quotation marks, brackets, footnote, and citation omitted).

Significantly, in reaching that conclusion, the majority rejected three limitations urged by the creditors committee.  First, the majority rejected the committee's argument that the final clause of the Section 741(8)'s definition, "commonly used in the securities trade," limits the safe harbor to those payments that are "commonly used in the securities trade."  *See* 651 F.3d at 335-36.  That phrase, the majority concluded, "is properly read as modifying only the term 'any other similar payment.'  The phrase is not a limitation on the definition of settlement payment, but

9

rather . . . it is a catchall phrase intended to underscore the *breadth* of the § 546(e) exemption."
*Id.* at 336 (emphasis in original) (internal quotation marks omitted).  In addition, the majority
reasoned, the committee's "proposed reading would make application of the safe harbor in every
case depend on a factual determination regarding the commonness of a given transaction."  *Id.*
That, in turn, "would result in commercial uncertainty and unpredictability at odds with the safe
harbor's purpose and in an area of law where certainty and predictability are at a premium."  *Id.*

   Second, the Court rejected the committee's argument that in order to qualify for the
"settlement payment" safe harbor, there had to be a purchase or sale of securities.  *See id.* at 336-
38.  The majority agreed that "settlement," in the context of the securities industry, "refers to the
completion of a securities transaction," but found no support in the Bankruptcy Code for "a
requirement that title to the securities changes hands."  *Id.* at 337 (internal quotation marks
omitted).  The majority was unswayed by Judge Koeltl's argument in dissent that, without a
purchase-or-sale requirement, the safe harbor would apply to "any payment on account of a debt
evidenced by a writing," thereby "imperil[ing] decades of cases that allow the avoidance of debt-
related payments."  *Id.* at 347 (Koeltl, J., dissenting).  These cases, the majority explained,
"involve[d] non-tradeable bank loans, not widely issued debt securities."  *Id.* at 337 (majority
opinion) (citing cases).  Thus, "[c]oncluding that the safe harbor protects payments made to
redeem tradeable debt securities does not contradict caselaw permitting avoidance of payments
made on ordinary loans.  Interpreting the term 'settlement payment' in the context of the
securities industry will exclude from the safe harbor payments made on ordinary loans."  *Id.*

   Finally, the panel majority rejected the committee's argument that a transfer qualifies as a
"settlement payment" only if it involved a financial intermediary that took a beneficial interest in
the securities during the course of the transaction, thereby implicating the systemic risks that

motivated Congress's enactment of the safe harbor.  *See id.* at 338-39.  In doing so, the Court

relied on the decisions of three other courts of appeals, which had applied Section 546(e) to

payments involving "financial intermediaries who served only as conduits."  *Id.* at 338 & n.3

(citing *In re Plassein Int'l Corp.*, 590 F.3d 252, 257-59 (3d Cir. 2009); *In re QSI Holdings, Inc.*,

571 F.3d 545, 549-50 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 986

(8th Cir. 2009)).  Analogizing to those decisions, the Court found "no reason to think that

undoing Enron's redemption payments, which involved over a billion dollars and approximately

two hundred noteholders, would not" have a "substantial impact on the stability of the financial

markets" — merely because the Depository Trust Company "acted as a conduit and recordkeeper

rather than a clearing agency that takes title to the securities during the course of the

transaction."  *Id.* at 338.  Moreover, the Court continued, Section 546(e) applies on its face, and

without limitation, to settlement payments made "by or to (or for the benefit of)" various

participants in the financial markets.  11 U.S.C. § 546(e).  "It would appear inconsistent with this

language for courts to limit the safe harbor circuitously by interpreting the definition of

'settlement payment' to exclude payments that do not involve a financial intermediary that takes

title to the securities during the course of the transaction."  *Id.* at 339.[3]

In light of the Circuit's holding and analysis in *Enron*, this case is easily decided.  As

Judge Peck correctly held, the Circuit's test for whether a payment qualifies for the safe harbor

"is both uncomplicated and crystal clear — a settlement payment, quite simply, is a 'transfer of

cash [to a financial institution] . . . made to complete [a] securities transaction.'"  *Quebecor*, 453

B.R. at 215 (quoting *Enron*, 651 F.3d at 334); *accord Secs. Investor Prot. Corp. v. Bernard L.*

---

[3]     The Second Circuit denied the Enron Creditors Committee's petition for rehearing or for
rehearing *en banc* on December 2, 2011.  (*See* Annex to Appellees' Br.)

*Madoff Invest. Secs. LLC*, — B.R. —, 2012 WL 1505349, at *4 (S.D.N.Y. Apr. 30, 2012).

"Under this easy-to-apply formulation," the payments at issue in this case plainly fall within the

safe harbor. *Quebecor*, 453 B.R. at 215. First, QWUSA transferred cash — more than $376

million of it — to purchase the Notes. Second, QWUSA wired the money from its account at

Bank of America to the trustee for the Noteholders, CIBC, which qualifies as a "financial

institution" for purposes of Section 546(e). *See* 11 U.S.C. § 101(22) (defining "financial

institution"). Finally, the payment was made to "complete" a securities transaction, as the Notes

indisputably qualify as "securities" under the Bankruptcy Code. *See id.* § 101(49)(A)(i)

(defining the "term 'security'" to include a "note"). Put simply, "[t]he payments at issue were

made to [purchase] or redeem [notes], which the Bankruptcy Code defines as a security. They

thus constitute the transfer of cash . . . made to complete a securities transaction and are

settlement payments within the meaning of § 741(8)." *Enron*, 651 F.3d at 339 (internal

quotation marks, brackets, footnote, and citation omitted).

      Appellant's arguments to the contrary are unavailing. First, noting that the payments in

this case did not involve a formal settlement process using broker-dealers and the DTC to effect

the immediate exchange of payment and securities, Appellant contends that *Enron* is

distinguishable. (Appellant's Br. at 15-16). Admittedly, this argument finds some support in the

way the *Enron* Court framed the question presented. *See* 651 F.3d at 333-34 ("Here, we review

only the issue the district court agreed to hear on appeal: 'whether the § 546(e) "safe harbor" . . .

extends to transactions in which commercial paper is redeemed by the issuer prior to maturity,

using the customary mechanism of the Depository Trust Company.'") (quoting *In re Enron,* 422

B.R. at 424). It finds no support, however, in the Court's ultimate holding that, in the context of

the securities industry, a settlement payment means simply "the transfer of cash or securities

made to complete a securities transaction." *Id.* at 334 (internal quotation marks and brackets omitted). Moreover, the *Enron* Court concluded that Section 546(e) must be interpreted by looking to its plain language, *see id.* at 335, 339, and nothing in the statute suggests that application of the safe harbor turns on the involvement of broker-dealers, customary mechanisms of settlement such as the DTC, or an immediate exchange of securities. In fact, the *Enron* Court adopted the reasoning of a line of cases that have "expressly rejected the argument that 'settlement payments' must travel through the settlement system." *Plassein Int'l Corp.*, 590 F.3d at 258 (characterizing an early case in that line), *cited in Enron*, 651 F.3d at 338-39.

Second, Appellant contends that the Bankruptcy Court erred in holding that the payments at issue were made to a "financial institution," as required (in the context of this case) to qualify for the safe harbor. (Appellant's Br. at 24-25). Appellant does not dispute that CIBC, the actual recipient of the transfer, qualifies as a "financial institution" for purposes of the Bankruptcy Code.[4] Instead, relying on the Eleventh Circuit's decision in *In re Munford*, 98 F.3d 604, 610 (11th Cir. 1996), it argues that CIBC "was 'nothing more than [an] intermediary or conduit,' and thus cannot be used to satisfy the requirement under Section 546(e) that the transfer be made by or to a financial institution." (Appellant's Br. at 24 (quoting *Munford*, 98 F.3d at 610)). At least three courts of appeals, however, have expressly rejected *Munford*, holding that "the plain language of § 546(e) simply does not require a 'financial institution' to have a 'beneficial interest' in the transferred funds." *QSI Holdings, Inc.*, 571 F.3d at 551; *accord Contemporary Indus. Corp.*, 564 F.3d at 986-87; *In re Resorts Int'l, Inc.*, 181 F.3d 505, 516 (3d Cir. 1999). And while the Second Circuit did not explicitly discuss *Munford* in *Enron*, it followed these

---

[4]    Nor does Appellant dispute that some of the Noteholders would qualify as financial institutions in their own right.

other courts in holding that Section 546(e) may not be limited "circuitously by interpreting the definition of 'settlement payment' to exclude payments" to "financial intermediaries who served only as conduits." 651 F.3d at 338 (citing *Plassein Int'l Corp.*, 590 F.3d at 257-59; *QSI Holdings, Inc.*, 571 F.3d at 549-50; *Contemporary Indus. Corp.*, 564 F.3d at 986)). *See generally* Christopher W. Frost, *The Continued Expansion of Section 564(e): Has the Safe Harbor Swallowed the Rule?*, 31 No. 10 BANKR. L. LETTER 1, 2 (Oct. 2011) (citing *Enron* as the latest in a "large, and growing, number of cases" that "find a settlement payment anytime a financial institution serves as an intermediary to conclude a sale and purchase of a security"). In light of *Enron* and the plain language of Section 546(e) — which requires only that a payment be made "by or to (or for the benefit of)" a financial institution — Appellant's argument fails.

Finally, noting that Congress intended for Section 546(e) to protect against systemic threats to the marketplace, Appellant contends that the payments at issue here are not within the ambit of those that Section 546(e) was designed to protect because they did not involve a central counterparty. (Appellant's Br. at 19-21). Relatedly, Appellant contends that if Judge Peck's decision is affirmed, Section 546(e) would apply to "the prepayment of any ordinary loan evidenced by the private note." (Appellant's Br. at 21). In the abstract, these arguments have some force given, among other things, the circularity of the definition of "settlement payment" in Section 741(8); indeed, were this Court writing on a blank slate, it might well conclude that they called for a narrower definition of "settlement payment" that excluded the payments here. *See also Quebecor*, 453 B.R. at 217 (noting that because the definition given to "settlement payment" in *Enron* "is so general in its application (as noted by the dissent with reference to the impact on recovering preferential payments of unsecured loans), does not advert to Congressional intent (except to say that to do so would not change the result) and applies to any

14

qualifying transfer, even one with no demonstrated connection to the securities markets," it "may extend protection to transfers that Congress never intended to immunize and may lead to unintended consequences"); Frost, 31 No. 10 BANKR. L. LETTER at 3 ("[T]he net effect of *Enron* may be allow the parties to insulate most debt held by financial institutions from the reach of the preference laws — a result seemingly far afield from that intended by Congress.").

The Court is not writing on a blank slate, however, but is bound to follow the Second Circuit's decision in *Enron*. *See, e.g.*, *United States v. Russotti*, 780 F. Supp. 128, 131 (S.D.N.Y. 1991) ("[I]t is axiomatic that a district court cannot simply take a position contrary to that of its circuit court and regard the circuit court's interpretation of a given statute as not binding."). And in relying on the plain language of Section 546(e) to adopt an "extremely broad" definition of "settlement payment," the Second Circuit squarely rejected the precise arguments made by Appellant here (most, if not all, of which were made forcefully by Judge Koeltl in his dissent). *Enron*, 651 F.3d at 334 (internal quotation marks omitted); *see id.* at 337 (rejecting the dissent's argument that a narrower definition of settlement payment was warranted to avoid its application to prepayment of ordinary loans); *id.* at 338-39 & n.3 (rejecting "a restriction on the safe harbor that would limit it to transactions involving central counterparties"); *id.* at 339 (declining to look at legislative history in light of the plain language of Section 546(e)); *see also Secs. Investor Prot. Corp.*, 2012 WL 1505349, at *5 (relying on "the broad and literal interpretation given § 546(e) in *Enron*" to reject an argument that the statute should be read, in light of its purpose, to exclude fraudulent brokerage firms and transactions).[5] If the broad definition given by the

---

[5]      Even if Section 546(e) could be limited to payments that, if avoided, might trigger systemic risks to the marketplace, the payments in this case might well qualify.  As the Bankruptcy Court explained, the Noteholders are large financial institutions that "customar[ily] participa[te] in the secondary market for private placements notes," a market in which "holdings

*Enron* Court to the term "settlement payment" is to be narrowed, it must come from the Circuit itself or from the Supreme Court, not from this Court.

## C.  The Safe Harbor for Payments in Connection with a Securities Contract

The Court's conclusion that the payments at issue qualify as "settlement payments" within the meaning of Section 546(e) is sufficient to decide this appeal.  Nevertheless, out of an abundance of caution, and because the issue has been fully briefed by the parties (Appellant's Br. at 21-24; Appellees' Br. at 22-24), the Court will address the Bankruptcy Court's alternative basis for granting Appellees' summary judgment — namely, that the transfers in question were "made by to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract."  *Quebecor*, 453 B.R. at 212 n.7.  As noted, citing the "comprehensive language" of the statute — which defines "securities contract" to include "a contract for the purchase, sale, or loan of a security, . . . including any repurchase . . . transaction on any such security," 11 U.S.C. § 741(7)(A)(i) — Judge Peck held in a footnote that the NPA was a securities contract and concluded that the transfers at issue "[p]lainly" occurred "in connection with" them.  *Quebecor*, 453 B.R. at 212 n.7.  Further, in doing so, he rejected Appellant's argument that the definition of "securities contract" should not be read to include a contract for the redemption — as opposed to purchase, sale, or repurchase — of a security.  "*Enron*," Judge Peck reasoned, "makes clear that the safe harbor applies to redemptions and has destroyed that argument."  *Id.*

---

routinely are traded from one institution to another."  *Quebecor*, 453 B.R. at 217.  Thus, the prepayment of the Notes — totaling approximately $376 million — was arguably "sufficiently material in amount as to be potentially significant from a systemic point of view, and avoiding a transaction such as this conceivably could impact the original issue or secondary markets for private placement indebtedness."  *Id.*

As Appellant argues on appeal (Appellant's Br. at 22), this reasoning is flawed.  Contrary to the Bankruptcy Court's conclusion, the *Enron* Court did not hold broadly that the safe harbor — that is, Section 546(e) itself — applies to redemptions in all respects.  It merely interpreted and applied the meaning of the term "settlement payment" in Section 546(e), holding that, because there is no purchase-or-sale requirement on the face of the statute defining *that* term, it extends to redemptions of securities.  *See Enron*, 651 F.3d at 336-37.  That holding, however, does not extend to the "securities contract" prong of Section 546(e), as "securities contract" is defined separately.[6]  In fact, if anything, the *Enron* decision actually supports Appellant's argument rather than "destroy[ing]" it, *Quebecor*, 453 B.R. at 212 n.7, as the case stands for the proposition that Section 546(e) and the definitional provisions incorporated therein should be interpreted according to their plain terms.  *See* 651 F.3d at 339 (declining to address legislative history and bankruptcy policy arguments).  That is, to the extent relevant here, Section 741(7) *does* include a purchase-or-sale requirement, as it expressly defines "securities contract" to mean a contract "for the purchase, sale, or loan" of a security.  11 U.S.C. § 741(7)(A)(i).  "[L]ooking to the statute's plain language," as *Enron* instructs, 651 F.3d at 339, it follows that the definition of "securities contract" is limited to contracts "for the purchase, sale, or loan of a security" and does not extend to contracts for the redemption of a security, as the Bankruptcy Court held.

Nevertheless, for different reasons, this Court concludes that the payments at issue do in fact qualify as transfers in connection with a securities contract.  *See, e.g.*, *Freeman v. Journal Register Co.*, 452 B.R. 367, 369 (S.D.N.Y. 2010) (noting that a district court, on appeal from a

---

[6]     Moreover, the "securities contract" prong of Section 546(e) was only added to the statute in 2006, five years after Enron filed its Chapter 11 petition.  *See* Financial Netting and Improvement Act, Pub. L. No. 109-360 (2006).

bankruptcy court, "may affirm on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below").  That is because, as it was ultimately structured, the transaction at issue was in fact a "purchase" (or "repurchase") of the Notes rather than a "redemption."  To be sure, QWCC initially sent a "Notice of Redemption" to the Noteholders stating that, on October 29, 2007, it intended to "redeem" in full all outstanding Notes under Section 8.2 of the NPA.  (*E.g.*, JA-23 Exs. B5-11 at 16).  Prior to that date, however, QWI decided for tax reasons to restructure the deal as a "purchase" of the Notes by QWUSA, which it was permitted to do pursuant to Section 8.6 of the NPA.  (Appellant's Br. at 11-12).  Thus, on October 25, 2007, QWUSA provided notice to the Noteholders that it would pay the "Redemption Price" set forth in the earlier Notice of Redemption, which would "result in QWUSA purchasing the Notes." (*E.g.*, JA-23 Exs. B12-18 at 1).[7]  QWUSA's "purchase" was indisputably made "in connection with" the NPA — specifically, it was made pursuant to Sections 8.2 and 8.6 of the NPA — and the NPA plainly qualifies as a contract.  Further, for the reasons stated above, the transfers at issue were made to a financial institution, namely CIBC.

---

[7]       Strictly speaking, although the amended notices stated that QWUSA was purchasing the Notes pursuant to Section 8.2 of the NPA, that provision governs redemptions by QWI.  Section 8.6 allowed QWI or an affiliate such as QWUSA to purchase the Notes "(a) upon the payment or prepayment of . . . the Notes in accordance with the terms of this Agreement and the Notes or (b) pursuant to an offer to purchase made . . . pro rata to the holders of all Notes at the time outstanding at the same time and upon the same terms and conditions."  (JA-23 Exs. A1, A2 § 8.6).  The fact that the amended notice cited Section 8.2 rather than Section 8.6, however, does not change the essential fact that the deal was ultimately structured as a purchase.  Nor does the fact — emphasized by Appellants (Appellant's Br. at 23) — that some Noteholders treated the transaction as a redemption rather than a purchase, by, for example, stamping "PAID IN FULL" on the Notes returned to QWI.

Thus, the transfer at issue was a "transfer made by to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract." 11 U.S.C. § 546(e).[8]

## CONCLUSION

For the reasons discussed above, the order of the Bankruptcy Court is AFFIRMED. The Clerk of Court is directed to close this case.


SO ORDERED.

Dated: September 28, 2012
New York, New York

JESSE M. FURMAN
United States District Judge

---

[8]      It could be argued that the transfers qualify for the safe harbor whether or not they were redemption or purchase payments because, either way, they were made in connection with the NPA and the NPA qualifies as a "securities contract" because it governed the *initial* purchase of the Notes from QWI. After all, on its face, Section 546(e) requires only that the transfer be made "in connection with a securities contract," defined as a contract that governs the purchase or sale of a security; it does not require that the transfer be made in connection with the purchase or sale itself. Moreover, as courts in this district have explained, "[i]t is proper to construe the phrase 'in connection with' broadly to mean 'related to.'" *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012). In light of the conclusion above, however, the Court need not reach this argument.